# Exhibit A

eFiled
9/30/2024 4:39:55 PM
Superior Court
of the District of Columbia

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| **SHERON JONES,**<br>859 51st Street SE<br>Washington, DC 20019<br><br>Plaintiff,<br><br>v.<br><br>**VINTAGE EQUITY GROUP, LLC,**<br>913 N Market Street, Suite 200<br>Wilmington, DE 19801<br><br>**DAYON ARRINGTON,**<br>11306 Connecticut Avenue<br>Kensington MD 20895<br><br>**SUTTONPARK CAPITAL, LLC,**<br>2255 Glades Road, Suite 100E<br>Boca Raton, FL 33431<br><br>**SUTTONPARK LIFE CONTINGENT, LLC,**<br>2255 Glades Road, Suite 100E<br>Boca Raton, FL 33431<br><br>**and**<br><br>**TRUIST BANK, N.A.**<br>214 North Tryon Street<br>Charlotte, NC, 28202<br><br>Defendants. | **Civil Action No: 2024-CAB-004523**<br><br>**JURY TRIAL DEMANDED**<br><br>**Judge Yvonne Williams**<br><br>**Remote Initial Scheduling Conference:**<br>**10/18/24 at 9:30 AM** |

## AMENDED COMPLAINT

SHERON JONES ("**Plaintiff**" or "**Ms. Jones**") files this action against Defendants

Vintage Equity Group, LLC ("**Vintage**"); Dayon Arrington ("**Mr. Arrington**"), SuttonPark Life

Contingent, LLC ("**SPLC**") and SuttonPark Capital, LLC ("**SPC**") (together with SPLC

"**SuttonPark**"), and Truist Bank, N.A. ("**Truist**") (collectively, the "**Defendants**") for violations

1

of the District of Columbia's Structured Settlements Protection Act of 2018 ("SSPA"), D.C.

Code §§ 28A-101 *et seq.,* and the District of Columbia's Consumer Protection Procedures Act

("CPPA"), D.C. Code §§ 28-3901, *et seq.*, for the tort of conversion and civil conspiracy to

commit conversion, and to seek a declaratory judgment that the various contracts are void, or in

the alternative have been breached.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this case pursuant to

D.C. Code § 11-921.

2.      This Court has personal jurisdiction over Defendants pursuant to D.C.

Code § 13-423 because they transact business in the District of Columbia; they caused

tortious injury in the District of Columbia by an act or omission in the District of Columbia;

or they caused tortious injury in the District of Columbia by an act or omission outside the

District of Columbia and Defendants regularly do or solicit business, engage in any other

persistent course of conduct, or derive substantial revenue from services rendered in the

District of Columbia.

3.      Venue is proper in the District of Columbia because it is where the

transactions leading to this action occurred.

## PARTIES

4.      Plaintiff Sheron Jones ("**Plaintiff**" or "**Ms. Jones**") is a vulnerable adult

who has resided in the District of Columbia at all relevant times.

5.      Defendant Vintage Equity Group, LLC ("**Vintage**") is a Delaware limited

liability company with its principal place of business at 913 N Market Street, Suite 200,

Wilmington, DE 19801. Vintage also maintains an office in Maryland, located at 17 W

2

Jefferson Street, Suite 107, Rockville, MD 20850. Vintage purchases payment streams from structured-settlement holders, a practice referred to as "structured-settlement factoring."  As described below, Vintage provides advance payments to consumers that are to be repaid through a deduction from the proceeds of structured-settlement transfers once those transactions are completed. These advances are extensions of credit to consumers, and therefore consumer goods or services under the CPPA. D.C. Code § 28-3901(a)(7). Vintage is therefore a "merchant" under the CPPA. D.C. Code § 28-3901(a)(3). At all times relevant herein, Vintage was acting by and through its agents, servants, and/or employees, all of whom were acting within the scope of their employment, for and on behalf of Vintage.

6.    Defendant Dayon Arrington ("**Mr. Arrington**") was, at all relevant times, an employee and agent of Vintage or Vintage's co-conspirator.

7.    Defendant SuttonPark Life Contingent, LLC ("**SPLC**") is a Delaware limited liability company. Upon information and belief, its principal place of business is at 2255 Glades Road, Suite 100E, Boca Raton, FL 33431. SPLC is Vintage's "assignee" in the transfers of Ms. Jones's structured settlement payments.

8.    Defendant SuttonPark Capital, LLC ("**SPC**") is a Delaware limited liability company with its principal place of business at 2255 Glades Road, Suite 100E, Boca Raton, FL 33431.

9.    Defendant Truist Bank, N.A. ("**Truist**") is a national bank headquartered at 214 North Tryon Street, Charlotte, NC, 28202, that has numerous branch locations in the District of Columbia. Truist was formed in 2019 with the merger of BB&T Bank and SunTrust Bank, both of which operated branch locations in the District of Columbia. Upon information and belief, Truist is the successor-in-liability to SunTrust Bank. At all times

3

relevant to this complaint, Truist either was doing business as SunTrust Bank or had not finished effectuating the merger. Either way, Truist is responsible for the actions of SunTrust Bank and is referred to both as "**SunTrust**" and "**Truist**" herein.

<u>**FACTUAL ALLEGATIONS**</u>

**A.** <u>**Vintage and SuttonPark Are in the Business of the Structured Settlement Secondary Market.**</u>

10.     Structured settlements are established by legal judgments or settlements of tort claims to provide recipients with an arrangement for periodic payment of damages for personal injuries. Structured settlements are often used to ensure the financial well-being of victims who have suffered long-term physical or cognitive harm.

11.     At all times relevant to this Complaint, Vintage and SuttonPark were in the business of brokering and purchasing structured settlement payment streams at a discount. This business is commonly known as the structured settlement secondary market.

12.     The District of Columbia's Structured Settlements Protection Act of 2018 ("**SSPA**") requires a court approval process that companies like Vintage and SuttonPark need to comply with in order to avoid incurring a stiff punitive federal excise tax under 26 U.S.C. § 5891. D.C. Code Section 28A-101 *et seq.* The purpose of the SSPA was at least in part to protect consumers who may wish to sell structured settlement payments.

**B.** <u>**Ms. Jones Is Intellectually Disabled as a Result of Lead Poisoning.**</u>

13.     From Ms. Jones's birth in 1979 to 1985, she was poisoned by exposure to hazardous lead paint. As a result of that exposure, Ms. Jones suffered serious, permanent, and irreversible neuropsychological injuries.

14.     It is well known that lead exposure in children "can severely damage the brain," can cause "permanent intellectual disability," and "can permanently affect children's

4

brain development, resulting in reduced intelligence quotient (IQ), behavioural changes including reduced attention span and increased antisocial behaviour, and reduced educational attainment." "Lead Poisoning," World Health Organization (Sept. 27, 2024) (accessed on Sept. 30, 2024), available at https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health; see also "The Poisoning of Children Around the World," New York Times (August 5, 2016) (accessed on September 30, 2024), available at https://archive.nytimes.com/kristof.blogs.nytimes.com/2016/08/05/the-poisoning-of-children-around-the-world/.

15.    Ms. Jones struggles with severe learning disabilities and other cognitive impairments. A neuropsychological evaluation conducted when Ms. Jones was in middle school found that she had a Full-Scale IQ of 56—putting her in the bottom *0.2* percentile rank for her age—and that she had "significant limitations in both the verbal/language and nonverbal/visual domains." The evaluation further noted that she demonstrated "very weak skills in all aspects of concept formation, logical analysis, abstract reasoning, and practical reasoning/common-sense judgment." The report concluded that Ms. Jones's "deficits reflect permanent cognitive impairment which will pose life-long challenges for [her]."

16.    Ms. Jones had an Individualized Education Plan (IEP) throughout her education. This, along with the support of her family, enabled her to graduate from high school.

17.    In 1997, Ms. Jones received an award of periodic payments in connection with the settlement of a lawsuit following the discovery of Ms. Jones's lead poisoning.  Ms. Jones was to receive the following structured settlement payments from BHG Structured Settlements, Inc. and Berkshire Hathaway Life Insurance Company of Nebraska:

Commencing April 3, 1998, the sum of Seven Hundred Twenty Dollars ($720.00) per month, increasing by 2% on April 3, 1999 and each April 3 thereafter, payable on the 3rd day of each month, until the death of Sheron Monick Jones or until March 3, 2028, whichever period is longer (360 Certain Monthly Payments).

Certain deferred lump sums payable on the following basis:

| Payment Date | Payment Amount |
| --- | --- |
| April 3, 2007 | $30,000 (Thirty Thousand Dollars) |
| April 3, 2014 | $60,000 (Sixty Thousand Dollars) |

18.     Ms. Jones is intellectually disabled. Her only sources of income are Supplemental Security Income (SSI)[1], which she receives because of her Intellectual Disability, and Temporary Assistance for Needy Families (TANF). As an adult, she has been unable to find stable employment and has only briefly been employed since she turned eighteen almost 30 years ago: she worked at an Ames department store for 3-4 months and a movie theater for 1-2 weeks. Now in her forties, she can read only at a 3rd grade reading level.

19.     Ms. Jones has never driven a car and does not have a driver's license.

20.     Ms. Jones, her fifteen-year-old daughter, and Ms. Jones's mother, Terry Jones, (collectively, "the Jones Family") live together. Terry Jones helps to care for Ms. Jones's daughter.

---

[1] The Social Security Administration's guide for medical professions, "Disability Evaluation Under Social Security," includes the following description of "intellectual Disability:"
   a.   This disorder is characterized by significantly subaverage general intellectual functioning, significant deficits in current adaptive functioning, and manifestation of the disorder before age 22. Signs may include, but are not limited to, poor conceptual, social, or practical skills evident in your adaptive functioning.
   b.   The disorder that we evaluate in this category may be described in the evidence as intellectual disability, intellectual developmental disorder, or historically used terms such as "mental retardation."
(https://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm, last accessed September 29, 2024)

21.     Until Ms. Jones became involved with Vintage, her monthly annuity payment was deposited directly into her FedChoice Federal Credit Union account like clockwork. Ms. Jones relied on these monthly annuity payments to help cover her and her daughter's basic living expenses.

22.     Although Terry Jones was encouraged to obtain guardianship over Ms. Jones due to her intellectual disability, Terry Jones has sought to maximize her daughter's independence and self-determination by enabling Ms. Jones to engage in supported decision-making while also establishing guardrails to protect Ms. Jones from the heightened vulnerabilities and risks that come with being intellectually disabled. When supporting Ms. Jones with a decision, Terry Jones helps Ms. Jones understand issues, options, risks and consequences of decisions; empowers Ms. Jones to make choices; and assists as asked and needed to carry out Ms. Jones's decisions. Some of the guardrails that Terry Jones has put in place include sharing a household with Ms. Jones and her daughter, discouraging Ms. Jones from using credit cards and other forms of credit, and helping Ms. Jones open a bank account at a small, trusted credit union used by other members of the family.

**C.  Vintage Schemed to Exploit Ms. Jones.**

23.     In or around early 2021, Ms. Jones came into contact with Vintage. Ms. Jones did not tell anyone, including her mother and daughter, that she was talking to Vintage, and Ms. Jones was accordingly unsupported in her dealings with them.

24.     Ms. Jones gave Vintage written consent to access her medical records sometime after coming into contact with them.

25.     While Ms. Jones was unsupported in her decision-making and therefore lacking capacity to comprehend the nature, extent, character, and effect of any agreement

with Vintage, Ms. Jones apparently entered into an agreement with Vintage to sell a portion of her monthly annuity payments in return for lump sum payments. All of the periodic payment rights transferred from Ms. Jones to Vintage (the "**Periodic Payments**") were assigned to SuttonPark by Vintage.

26.     Vintage knew that any agreement to sell or transfer structured settlement periodic payments in the District of Columbia required court approval under the SSPA. Vintage filed two petitions in D.C. Superior Court seeking court approval to purchase 312 months of Ms. Jones's Periodic Payments pursuant to the SSPA (the "**Vintage Petitions**").

27.     Ms. Jones was not represented by counsel at any time during her interactions with Vintage, nor was she represented by counsel in connection with the Petitions filed in D.C. Superior Court.

28.     The first petition involved a proposed sale of 240 months' worth of Ms. Jones's Periodic Payments (April 3, 2028, through May 3, 2048). The aggregate amount of these payments is $380,257.80, and the discounted present value of the payments at the time of the agreement was $341,900.14 per the disclosure statement. The lump sum payment that Vintage agreed to give Ms. Jones in exchange for these payments was $63,098.58, which represented only about 18% of the estimated present value of those payments. The disclosure statement for this transaction stated, "you will, in effect, be paying interest to us at a rate of 11.89 percent per year." The second petition involved a proposed sale of 72 months' worth of Ms. Jones's Periodic Payments (April 3, 2022 through March 3, 2028). The aggregate amount of these payments is $87,662.88, and the discounted present value of the payments at the time of the agreement was $83,824.20 per the disclosure statement. The lump sum payment that Vintage agreed to give Ms. Jones in exchange for these payments was

$50,021.10, which represented about 57% of the estimated present value of those payments. The disclosure statement for this transaction stated, "you will, in effect, be paying interest to us at a rate of 17.32 percent per year." The total amount that was to be paid to Ms. Jones based on the two Vintage Petitions was $113,119.68.

29.     Vintage provided advance payments to Ms. Jones while she waited to complete the paperwork and finalize the transfers of her Periodic Payments. Vintage made these payments to Ms. Jones via CashApp in amounts ranging from $100 to $500 and totaling at least $5,600. The advance payments were repaid to Vintage through a deduction from the proceeds from the structured settlement transfers once those transactions were completed. The advance payments were extensions of credit to Ms. Jones. Ms. Jones spent much of the advance payment money on her daughter. Vintage's advance agreements stated that Ms. Jones was required to cooperate fully with the company in obtaining court approval for the contemplated transfers and that Ms. Jones would be liable for the advance if the transactions were not completed. Vintage did not disclose its advance payment agreements with Ms. Jones to the Court.

**D.  <u>Vintage Repeatedly Made Material Misrepresentations to Ms. Jones.</u>**

30.     The disclosure statements that Vintage provided to Ms. Jones pursuant to the SSPA misrepresented Ms. Jones's right to cancel the transactions. Vintage's disclosure statements said that Ms. Jones could cancel the transfer agreements "<u>not later than the close of business on the third business day after the date the agreement is signed</u>[.]" Under the SSPA, Ms. Jones was entitled to cancel the transfer agreements "<u>at any time before entry of a final court order approving the transfer</u>." *See* D.C. Code § 28A-103(9) (emphasis added). The first petition was not approved by the court until nearly four months after the transfer

agreement was signed, and the second petition was not approved by the court until nearly two months after the transfer agreement was signed. In both cases, Ms. Jones had significantly more time to cancel the transfer agreements than Vintage represented in their disclosure statements.

31.    The Transfer Agreements between Ms. Jones and Vintage contained a "Holdback" clause, which stated: "In the event that the Closing occurs within sixty (60) days of the first scheduled monthly payment of the Periodic Payments, I[, Sheron Jones,] understand that You[, Vintage,] may, in your discretion, at the Closing, hold in Your bank account and deduct from the Purchase Price to be paid to Me, an amount equal to no more than the first two (2) monthly payments to be received by You under this Agreement." Despite this, Vintage withheld far more from its payments to Ms. Jones than the equivalent of two of her Periodic Payments.

**E.  Vintage Repeatedly Made Materials Misrepresentations to the Court.**

32.    Throughout the two court cases involving the transfer of Ms. Jones's payments to Vintage, Vintage repeatedly misrepresented facts to the Court.

33.    Vintage knew where Ms. Jones lived at the time of filing the Vintage Petitions, but it provided the wrong address to the Court to conceal its actions from Ms. Jones and her family, who would have become involved as decision supports for Ms. Jones if they came across mail from the Court and learned about the proceedings. Ms. Jones only received a small subset of documents related to the Vintage Petitions, but they were either hand delivered directly to Ms. Jones or emailed to her.

34.    In its Emergency Consent Motion to Request Expedited Hearing Date filed in regard to its first petition ("**Emergency Motion"**), Vintage made representations to

the Court that Ms. Jones urgently needed to sell her periodic payments because her current living situation "was not sustainable as there is not enough room for Transferor and daughter" and because "Due the (sic) COVID-19 Pandemic, Transferor is unable to get her own residence with her current income." Vintage also filed an affidavit purportedly from Ms. Jones in support of its Emergency Motion. The affidavit stated, "Further delays with a hearing will result in long term financial difficulties and a loss of residence. I am currently living with family members and there is no room for my daughter and I." Ms. Jones does not recall writing, signing, or otherwise being aware of the affidavit.

35. All of Vintage's representations regarding Ms. Jones and her supposed need for housing were false. The Jones Family, at the time of the purported affidavit and thereafter, has been living at 859 51st Street SE, Washington, DC 20019, a four-bedroom house. Terry Jones bought the house in order to comfortably accommodate her daughter (Ms. Jones) and granddaughter (Ms. Jones's daughter). Each member of the Jones Family has their own bedroom. No one else has lived with the Jones Family at this address, and the fourth bedroom has remained unoccupied. Further, nothing about the pandemic prevented Ms. Jones from obtaining new housing. Additionally, upon information and belief, Vintage knew that Ms. Jones's only sources of income were SSI, TANF, and her periodic payments, none of which were impacted by the pandemic.

36. Vintage also claimed in its Emergency Motion that Ms. Jones, "seeks to use the transfer funds to purchase a vehicle so that she is not restricted to jobs in her vicinity." This was also false. Vintage knew or should have known that Ms. Jones was receiving SSI and unable to work. Vintage also knew or should have known that Ms. Jones

11

did not have a driver's license and does not know how to drive and that she therefore had no reasonable intention of buying a car.

37.    Vintage made misrepresentations to the Court about the severity of Ms. Jones's lead poisoning. In the hearing for the first petition, counsel for Vintage said that, to the best of his knowledge and understanding, "there hasn't been any sort of long-term effects of that exposure." In the hearing for the second petition, counsel said that Ms. Jones, "does not exhibit any effects of this exposure." The Court, satisfied with these representations made by counsel for Vintage, did not ask any follow-up questions about the lead poisoning or Ms. Jones's condition. The Court was left unaware that Ms. Jones has an intellectual disability.

38.    Vintage also coached Ms. Jones in real time whenever she appeared telephonically before the Court regarding the Petitions. Mr. Arrington went to Ms. Jones's home, sat next to her on the couch, and used his cell phone to dial into the hearings.  He did not disclose to the Court that he was present with Ms. Jones and used the mute/unmute feature on his phone to secretly instruct Ms. Jones on how to answer the Court's line of questions, including its questions regarding the reasons for her decision to sell her Periodic Payments. The phone number used to dial into at least one hearing had a "302" area code, indicating that it was a Delaware phone number. Vintage is headquartered in Delaware. Ms. Jones has never had a phone number with a "302" area code. During each hearing, Ms. Jones wanted to tell that judge that she did not want to continue with the agreement because she did not understand what was going on, but Arrington told her to say "No" when she was asked by the judge whether she had any questions. Ms. Jones's hands were shaking during the hearings. Mr. Arrington knew that Ms. Jones was nervous and scared.

12

39.     Vintage also violated the Court's transfer order for the first of the two Vintage Petitions.  That order stated: "ORDERED that Transferee shall pay Payee the net sum of $63,098.58 for the Assigned Payments. There shall be no additional fees, deductions, or offsets of any kind[.]" But Vintage subsequently emailed Ms. Jones a closing statement that listed a $10,000 deduction from the purchase price for "Holdback – Acknowledgement Order" and a $750 deduction for "IPA Authorization."

**F.  <u>Vintage and Mr. Arrington Financially Exploited Ms. Jones.</u>**

40.     Ms. Jones received three checks from SPC in the amounts of $47,548.58, $9,500, and $37,771.10, totaling $94,819.68. Ms. Jones did not understand that she had sold her Periodic Payments and that the checks were payment for their sale, so she did not take any steps to cash or deposit the checks.

41.     On or around October 13, 2021, Mr. Arrington picked Ms. Jones up from her home in Washington, D.C. and drove her to a SunTrust bank branch in Maryland. Upon information and belief, Mr. Arrington told branch employees that he was assisting his friend, Ms. Jones, with opening a bank account. A bank employee opened a checking account and a savings account for Ms. Jones. Mr. Arrington then instructed Ms. Jones to deposit $85,319.68 into the savings account and $9,500 into the checking account.

42.     On or around October 15, 2021, SunTrust sent two emails to Ms. Jones. The first email, received at 11:53am, indicated that her account had been enrolled in SunTrust Digital Banking. The second email, received at 12:51pm, stated that biometric authentication had been activated for her mobile banking account and that her account could now be accessed using Face ID, Touch ID, or Fingerprints instead of a username and

password. Ms. Jones does not use online or mobile banking, and she did not sign up for SunTrust Digital Banking or activate biometric authentication on this account.

43. On October 16, 2021, SunTrust sent an email to Ms. Jones at 1:37 a.m. stating that she had received an important notice regarding her SunTrust savings account: "Overdraft Coverage Acceptance Confirmation."

44. On October 18, 2021, SunTrust sent two emails to Ms. Jones regarding Mr. Arrington. The first email, received at 10:43 a.m., sought confirmation that Ms. Jones had "added or changed the contact info for Dayon Arrington." The second email, received six minutes later at 10:49 a.m., stated a $1,000 Zelle transfer from Ms. Jones's SunTrust Bank savings account to Mr. Arrington had finished processing.

45. Ms. Jones either did not see or was unable to comprehend any of the aforementioned emails that she received from SunTrust Bank due to her severe cognitive impairment.

**G. Ms. Jones Did Not Understand That She Sold Her Periodic Payments.**

46. In April 2022, the first month in which Ms. Jones' structured settlement payments were transferred to Vintage and/or SuttonPark, Ms. Jones expected to receive her payment and was confused when it was not deposited into her credit union account. She called the annuity obligor to ask why she had not received her annuity payment. She was informed that her payments had been transferred. Still confused, Ms. Jones immediately called her mother to tell her that the annuity money had not been deposited into her account. At this point, Terry Jones was still wholly unaware of Ms. Jones's interactions with Vintage.

47. After Terry Jones returned home from work, she asked Ms. Jones what had happened with the annuity payment. Ms. Jones did not understand what had happened to

her Periodic Payments, so she was unable to provide her mother with any explanation. Seeking answers for herself and her mother, Ms. Jones called Mr. Arrington and spoke to him on speakerphone while her mother was in the room. Ms. Jones asked Mr. Arrington what had happened to her annuity payments, and he told her to stop harassing him.

48. In the following days, Ms. Jones and Terry Jones attempted to call Mr. Arrington together to ask him what happened to Ms. Jones's money, but they were unable to reach him. When they called Vintage and asked to speak to Mr. Arrington, Vintage told them he was unavailable.

49. A few days later, Ms. Jones and her mother finally reached Mr. Arrington. Ms. Jones again asked him what had happened to her annuity payments, and he told her that she already knew what had happened. Terry Jones said to Mr. Arrington that Ms. Jones did not have her money, and Mr. Arrington responded that she needed to ask Ms. Jones about it. Mr. Arrington also threatened Ms. Jones by saying that he would call the police and have her put in jail if she did not stop harassing him about her money.

50. In or around June 2022, Ms. Jones suddenly received, by mail, copies of some of the court records relating to the Vintage Petitions. Unable to comprehend the records herself and afraid that they would upset her mother, Ms. Jones hid them in her bedroom drawer and did not discuss them with Terry Jones.

51. On or around September 22, 2022, Ms. Jones went to D.C. Superior Court to drop off a letter addressed "To Whom It May Concern." The letter stated that Ms. Jones had received only $7,000 and had not been paid the first payment of $50,021.10 or the second payment of $63,098.58. It further stated that Ms. Jones had been calling Vintage, which had not returned any of her phone calls. A D.C. Superior Court clerk provided Ms.

15

Jones with a case number of the case involving the second of the two Vintage Petitions filed

by Vintage, as well as the name of the judge who had handled the case. Ms. Jones wrote the

information provided by the clerk onto a plain piece of paper and included it with the letter as

a cover page. Ms. Jones also included a copy of all of the documents that she had received in

the mail in June 2022.

52.    Ms. Jones then returned the court record copies that she had received in

June 2022 to her bedroom drawer and waited for the Court to respond to her letter.

53.    Ms. Jones did not receive a response to her letter.

54.    In or around December 2022, Terry Jones went to Ms. Jones's bedroom

drawer to look for something and discovered the court records hidden in the drawer.

### H.    Truist Has Harmed Ms. Jones by Failing to Provide Her with Information About What Happened to Her Accounts and Wrongfully Retaining the Money She Was to Receive from SuttonPark.

55.    Of the $94,819.68 deposited into the SunTrust accounts, Mr. Arrington

fraudulently transferred $1,000 to himself. Upon information and belief, the accounts were

closed by SunTrust due to Mr. Arrington's fraudulent activity. Ms. Jones does not have

access to the money she deposited into these accounts.

56.    Ms. Jones did not receive any notification from Truist that her accounts

had been closed.

57.    Ms. Jones has made multiple attempts to get information from Truist about

what happened to her accounts and the money that had been deposited into them.

58.    A Truist branch manager explicitly suggested in two separate interactions

with Ms. Jones and her counsel that legal action may be necessary in order for Ms. Jones to

obtain the information that she was seeking. During the second interaction, the branch

manager said, "This may be a situation where you have to go the legal route."

59. Ms. Jones subpoenaed Truist for documents related to her accounts.

60. Truist's initial production in response to the subpoena was only six pages. After repeated follow-up by Ms. Jones's counsel, Truist produced three additional pages. None of the documents that have been produced by Truist provide any clue or explanation as to what happened to the remaining money that was in Ms. Jones's accounts.

61. During follow-up, Truist has said it does not know what happened to the funds in her account.

62. Truist is depriving Ms. Jones of some of the most basic information related to her accounts, such as the terms and conditions.

63. Lack of access to her money has harmed Ms. Jones.

64. Other than the above-referenced notice that $1,000 had been transferred from her SunTrust savings account to Mr. Arrington, Ms. Jones never received any communication from SunTrust stating that the $94,819.68 that was deposited into her SunTrust accounts was ever transferred, withdrawn, or otherwise removed from those accounts.

65. Upon information and belief, Truist is in control or possession of the remaining $93,819.68 that was deposited into Ms. Jones' SunTrust accounts.

## CAUSES OF ACTION

### COUNT I
**The Transfer Contracts Are Unenforceable and Should Be Declared Void Because Ms. Jones Lacked Capacity to Enter into the Agreements**
**(Against Vintage)**

66. Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

67.     A contract is voidable where entered into by a mentally incapacitated party. A person's ability to contract depends on the nature of the particular transaction at issue.

68.     Ms. Jones is an intellectually disabled adult who was at one time measured as having an IQ in the bottom two-tenths of a percentile and diagnosed with "very weak skills in all aspects of concept formation, logical analysis, abstract reasoning, and practical reasoning/common-sense judgment."

69.     Ms. Jones has always had the support of her mother or another trusted individual when making major decisions but did not have that support when allegedly agreeing to sell her annuity payments, depriving her of the capacity to understand the nature, extent, character, and effect of the sophisticated financial transactions in which she was engaged with Vintage.

70.     Ms. Jones specifically did not comprehend that she would stop receiving her monthly structured settlement payments as a result of her agreement with Vintage.

71.     The contracts between Vintage and Ms. Jones therefore should be declared void.

## COUNT II
### Unilateral Mistake
### (Against Vintage)

72.     Ms. Jones incorporates by reference the preceding paragraphs as if fully set forth herein.

73.      Ms. Jones fundamentally misunderstood the nature of her dealings with Vintage and believed that she was not surrendering any of her annuity payments by entering into the agreements with Vintage.

74.    Ms. Jones's belief that she was not surrendering her annuity payments caused her to acquiesce to the agreements with Vintage, and her mistaken belief therefore had a material effect on the agreed upon exchange of performances between the parties that was adverse to Ms. Jones.

75.    Upon information and belief, Vintage either knew of—or faultily caused—Ms. Jones' mistaken belief that she was not surrendering annuity payments as part of any agreement that she had with Vintage.

76.    Ms. Jones did not bear the risk of mistake with respect to any agreement with Vintage.

77.    As a result of the facts described above, Ms. Jones lost 312 months of her annuity payments.

## COUNT III
### Violation of the D.C. Consumer Protections and Procedures Act
### (Against Vintage)

78.    Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

79.    The CPPA prohibits unfair and deceptive trade practices in connection with the offer, sale, and supply of consumer goods and services, and establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia.

80.    Defendant Vintage is a "person" and "merchant" that provides "goods and services" within the meaning of the CPPA. *See* D.C. Code § 28-3901(a)(1), (3), (7). In particular, Vintage is a merchant because it provides a financial service by offering liquidity (or cash) to individuals—who normally use that cash for personal, household, or family

19

purposes—in exchange for an asset (the structured settlement payment rights), similar to how a bank might provide a secured loan to a consumer. Indeed, in this case, Vintage represented to the Court (albeit falsely) that Ms. Jones would use the money to buy herself a car and obtain new housing. In reality, she spent much of the money she did receive on her daughter. Regardless, giving Ms. Jones money for any of these purposes makes Vintage a merchant.

81.     Vintage also extended credit to Ms. Jones in the form of advance payments made via CashApp, which were repaid to Vintage through a deduction from the lump sums that Ms. Jones was ultimately meant to receive. Vintage's advance agreement stated that Ms. Jones was required to cooperate fully with Vintage in obtaining court approval for the contemplated transfer and that Ms. Jones would be liable for the advance if the transaction was not completed. These extensions of credit also make Vintage a merchant.

82.     On or around September 21, 2021, Vintage accessed Ms. Jones's TransUnion credit report. The category listed for the type of inquiry was "Finance/Personal."

83.     Ms. Jones utilized the financial service offered by Vintage by selling Vintage the rights to her Periodic Payments in exchange for lump sums of cash, including advances that she received prior to—and that were contingent upon—the sale of her Periodic Payments, and therefore she is a "consumer" under the CPPA.

84.     Vintage violated the CPPA by engaging in unfair, misleading, and deceptive trade practices, including but not limited to:

    a.     Vintage sent Ms. Jones disclosure statements that stated that she had a right to cancel the transfer agreements within three business days of signing, which constituted a misrepresentation as to a material fact which has the tendency to mislead. Under the SSPA, Ms. Jones had the right to cancel the transfer

20

agreements, without penalty or further obligation, at any time before the entry of a final court order approving the transfer. Vintage's misrepresentation is an unfair and deceptive trade practice that violates the CPPA, D.C. Code § 28-3904(e).

b.      In the Vintage Petitions, Vintage provided the Court with an incorrect address for Ms. Jones despite knowing her correct address. As a result, Ms. Jones did not receive any notices or orders from the Court, constituting an omission of a material fact that tends to mislead and is an unfair and deceptive trade practice that violates the CPPA, D.C. Code § 28-3904(f).

c.      Vintage represented that their transaction with Ms. Jones involved obligations which it did not have or involve, or which are prohibited by law, when it deducted, without making proper disclosures under the SSPA and in violation of the transfer orders issued by this Court, additional fees and expenses from the amounts that it paid Ms. Jones, which is an unfair and deceptive trade practice that violates the CPPA, D.C. Code § 28-3904(e-1).

d.      Vintage engaged in an unfair or deceptive trade practice in violation of the CPPA (D.C. Code § 28-3904) by: (i) practicing law without a license by instructing Ms. Jones on how to testify in court; (ii) doing this in order to finalize the structured settlement transfers, (iii) doing this with knowledge that Ms. Jones did not understand the proceedings and (iv) doing this with knowledge that the Court was unaware of Vintage's behind-the-scenes participation in the proceedings.

e.      Vintage engaged in an unfair and deceptive trade practice in violation of the CPPA by making misrepresentations to the Court in order to

21

persuade the Court that the transfers were in the best interests of Ms. Jones, which the Court was required to find pursuant to the SSPA. D.C. Code § 28-3904.

f.      Vintage engaged in an unfair and deceptive trade practice by intentionally and knowingly using deception, intimidation, or undue influence to obtain the property, including money, of a vulnerable adult, with the intent to deprive the vulnerable adult of the property in violation of the CPPA, D.C. Code § 22-933.01(a)(1).

85.      As a result, Plaintiff is entitled to all forms of relief provided under D.C. Code § 28-3905(k)(2).

## COUNT IV
### The Transfers Are Ineffective and Should Be Declared Void Because Vintage Violated the District of Columbia Structured Settlements Protection Act of 2018 ("SSPA"), D.C. Code §§ 28A-101 *et seq.*
### (Against Vintage and SuttonPark)

86.      Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

87.      Under the SSPA, "no direct or indirect transfer of structured settlement payment rights shall be effective . . . unless the transferee has provided the payee and other interested parties with the disclosures required by § 28A-103," among other requirements. D.C. Code § 28A-105(a).

88.      Disclosure statements under DC's SSPA must state: "That the payee has the right to cancel the transfer agreement, without penalty or further obligation, at any time before entry of a final court order approving the transfer." *See* D.C. Code § 28A-103(9) (emphasis added). The disclosure statements that Vintage filed with the Court stated that the payee had the right to cancel the transfer agreement, without penalty or further obligation,

22

"not later than the close of business on the third business day after the date the agreement is signed[.]" In doing so, Vintage acted in *per se* violation of D.C. Code § 28A-103(9).

89.     Additionally, Vintage failed to include in its disclosures a true and accurate "itemized listing of all applicable transfer expenses, other than attorney's fees and related disbursements payable in connection with the transferee's application for approval of the transfer, and the transferee's best estimate of the amount of any such fees and disbursements," in violation of D.C. Code § 28A-103.

90.     Because Vintage failed to provide Ms. Jones with the proper disclosures required by D.C. Code § 28A-103, the transfers of Ms. Jones's Periodic Payments were not legally effective. *See* D.C. Code § 28A-105(a).

91.     Because the transfers are not legally effective, the Court should declare the prior transfers void so that Ms. Jones can receive her annuity payments going forward and order SuttonPark to pay Ms. Jones the amount of the prior Periodic Payments it has received.

**COUNT V**
**Conversion**
**(Against Mr. Arrington and Vintage)**

92.     Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

93.     Defendants Mr. Arrington and Vintage unlawfully gained control over Ms. Jones's SunTrust mobile banking account and fraudulently transferred, at a minimum, $1,000 of Ms. Jones's money to Mr. Arrington.

94.     The conduct of Mr. Arrington and Vintage demonstrates that they engaged in an unlawful exercise of ownership, dominion, and control over the personal property of Ms. Jones in denial or repudiation of Ms. Jones's rights thereto.

95.    In doing so, Mr. Arrington and Vintage converted Ms. Jones's property.

96.    Ms. Jones understood from the actions of Vintage that Mr. Arrington had authority to act on its behalf, regardless of whether Vintage in fact instructed Mr. Arrington to take money from her SunTrust account.

97.    Upon information and belief, SunTrust Bank closed Ms. Jones's accounts due to Mr. Arrington's fraudulent activity.

98.    Despite her repeated attempts to get Vintage's and Mr. Arrington's help with locating her missing money, Ms. Jones has been unable to recover the money she was paid pursuant to the Court's orders.

99.    Ms. Jones has suffered financial and emotional damages as the direct and proximate result of the conversion.

## COUNT VI
### Civil Conspiracy to Commit Conversion
### (Against Vintage)

100.    Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

101.    Vintage and Mr. Arrington agreed to work together to take Ms. Jones' structured settlement payments away from her in an unlawful manner to personally benefit each of them.

102.    Among other things, Vintage misrepresented to the Court that Ms. Jones needed cash now to find a bigger home because she lived in an overcrowded home, when in reality she lived in a home with a spare bedroom.

103.    Vintage also misrepresented to the Court that Ms. Jones would use the cash to purchase a vehicle, even though Ms. Jones has never had a driver's license or had any intention of obtaining a driver's license.

104.    Vintage also misrepresented to the Court that Ms. Jones had no long-term effects from the lead poisoning, when in fact it had caused severe and permanent cognitive impairment.

105.    Among other things, Mr. Arrington participated in this scheme by not disclosing to the Court that he was present during the hearings and by directing Ms. Jones on how to respond to questions from the Court.

106.    Mr. Arrington also participated in this scheme by taking Ms. Jones to a SunTrust bank branch, opening accounts for her, and then withdrawing money from one or more of those accounts without her knowledge.

107.    Because of the actions of Vintage and Mr. Arrington, Ms. Jones was damaged in that her future Periodic Payments and most of the money Vintage was supposed to pay her for those future Periodic Payments were taken from her.

## COUNT VII
### Breach of Contract
### (Against Vintage)

108.    Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

109.    Under the terms of the "Holdback" clause in the transfer agreements between Vintage and Ms. Jones, Vintage was only entitled to withhold two months' worth of Periodic Payments from its payments to Ms. Jones and only on the condition that the payment transfers were to begin within sixty (60) days of closing.

110.    The closing for the first transfer occurred on or around June 17, 2021.

111.    The contract for the first transfer stated that the transfers were to begin on April 3, 2028.

112.    Vintage was not authorized to make any "holdback" deductions from the purchase price because the condition set forth in the "holdback" clause was not met.

113.    But Vintage subsequently emailed Ms. Jones a closing statement that listed a $10,000 deduction from the purchase price for "Holdback – Acknowledgement Order," and the payment that she received for her Periodic Payment rights was at least $10,000 less than she was entitled to receive.

114.    $10,000 was also more than two months' worth of Ms. Jones's Periodic Payments, exceeding the amount indicated in the holdback clause.

115.    Therefore, in the event that the Court holds that the contracts were valid notwithstanding Ms. Jones' other claims seeking to declare them void, Vintage is liable for breach of contract.

## COUNT VIII
**Any Truist Contracts are Unenforceable and Should Be Declared Void Because Ms. Jones Lacked Capacity to Enter into the Agreements**
**(Against Truist)**

116.    Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

117.    Ms. Jones is a vulnerable adult who, without the support of a trusted person, is unable to understand the terms and conditions of financial products due to her severe cognitive impairment.

26

118.    Ms. Jones did not have a trusted person to support her with her when she opened her bank accounts at SunTrust; therefore, she did not have capacity to agree to the terms and conditions of the new accounts.

119.    Moreover, Truist has been unable to produce any terms and conditions governing her accounts, even after receiving a subpoena requesting all account documents for Ms. Jones, including but not limited to account opening documents. Therefore, even if she had capacity to agree to such terms and conditions, she would have no way of knowing for sure what those terms and conditions are.

120.    The contracts between Truist and Ms. Jones, if any, should therefore be declared void and their relationship should be governed by common law.

**COUNT IX**
**Conversion**
**(Against Truist)**

121.    Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

122.    Truist possesses some amount of Ms. Jones's money that it has intentionally, wrongfully, and unlawfully seized from Ms. Jones's accounts in repudiation of her right to those funds.

123.    Truist has failed to return the funds from Ms. Jones's accounts to Ms. Jones.

124.    Ms. Jones has suffered financial and emotional damages as the direct and proximate result of Truist's conversion for which Truist is liable.

**COUNT X**
**Breach of Contract**
**(Against Truist)**

27

125.    Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

126.    Under the terms of their contract as would exist at common law, Ms. Jones would have the exclusive right to withdraw funds deposited into her accounts. Ms. Jones deposited $94,819.68 into her accounts, but Truist has refused to allow her to withdraw any of that money, in violation of their agreement.

127.    Although the undersigned counsel were able to find some SunTrust terms and conditions online, it is not clear if Truist believes those apply here, and in any event, as described above, the Court should apply common law to their relationship.

128.    Nevertheless, under the terms of the contract found online, if the bank closed her account, then the bank was obligated to notify her by mail or telephone that they had closed her account.

129.    Upon information and belief, Truist closed Ms. Jones's account but failed to notify her that her account had been closed.

130.    Furthermore, under those terms, at closing, Truist was also obligated to either mail Ms. Jones a check for the balance of collected funds in her account or work with Ms. Jones to arrange delivery of the check for her collected balance at a location mutually agreeable to Ms. Jones and Truist.

131.    Upon information and belief, Truist did not mail Ms. Jones a check with the balance of her collected funds, which was $93,819.68 at the time of closing. Truist has also refused to work with Ms. Jones on returning her collected funds to her.

28

132.    Therefore, in the event that the Court holds that the contracts were valid notwithstanding Ms. Jones' other claims seeking to declare them void, Vintage is liable for breach of contract.

133.    Ms. Jones seeks $93,819.68 in compensatory damages, plus fees and costs from Defendants.

## COUNT XI
### Violation of the D.C. Consumer Protections and Procedures Act
### (Against Truist)

134.    Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

135.    Truist has engaged in an unfair practice in connection with how it has handled its communications with Ms. Jones about her accounts.

136.    Truist has repeatedly deprived Ms. Jones of the information needed for her to locate the funds that were deposited into her account on or around October 13, 2021.

137.    This practice caused or is likely to cause Ms. Jones substantial injury as she has been unable to access the missing funds for nearly three years.

138.    Furthermore, Truist has engaged in an unfair and deceptive practice by violating § 1034(a) of the Consumer Financial Protections Act (CFPA), which requires banks to provide complete and accurate responses to consumer information requests. Although there are exceptions to this requirement, including confidential information or information collected to prevent fraud or money laundering, Truist has refused to cooperate with Ms. Jones's requests for records that are created in the regular course of business and that do not fall within any of the exceptions.

29

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully prays this Court for the following relief on a joint and several basis:

1) Declare that Defendants' actions, as described herein, violated the SSPA, D.C. Code §§ 28A-101 et seq., and therefore the transfers are not legally effective;

2) Declare that Defendants' actions, as described herein, violated the CPPA, D.C. Code § 28-3904;

3) Declare that the transfers of Ms. Jones's Periodic Payments are void and that the parties' agreements regarding those transfers are void;

4) Declare that the terms and conditions of any agreement between Truist and Ms. Jones are void;

5) Declare that Defendants' actions, as described herein, constituted conversion;

6) Order equitable relief, including recission of the agreements between Ms. Jones and the Defendants, restitution, and disgorgement of any of Defendants' ill-gotten gains and the proceeds of such, and award those amounts to Plaintiff;

7) Award Plaintiff damages, including:

   a. The greater of (a) treble damages, or (b) statutory damages in the amount of $1,500 per violation of the CPPA, pursuant to D.C. Code § 28-3904(k)(2)(A);

   b. Additional relief as may be necessary to restore Plaintiff's money, which was acquired by means of Defendants' unlawful trade practices under the CPPA, pursuant to D.C. Code § 28-3905(k)(2)(E);

   c. Punitive damages in an amount determined at trial, pursuant to common law and D.C. Code § 28-3905(k)(2)(C); and

30

d.   Compensatory damages, pursuant to D.C. common law, for Defendants'

conversion.

8)   Award Plaintiff reasonable attorney's fees and costs, including but not limited to pursuant

to D.C. Code § 28-3905(k)(2)(B);

9)   Award Plaintiff pre- and post-judgment interest to the extent allowable; and

10)  Award such other relief which the court determines proper, including but not limited to

pursuant to D.C. Code §§ 28-3905(k)(2)(F) and 28A-101 et seq.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: September 30, 2024                          Respectfully Submitted,

Courtney Wilkes, Esq. (Bar No: 1619298)
Tzedek DC | Staff Attorney
c/o UDC David A. Clarke School of Law
4340 Connecticut Ave NW, Suite 319
Washington, DC 20008
(202) 888-4511
cw@tzedekdc.org

31