## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHERON JONES,

            *Plaintiff*,

    v.

VINTAGE EQUITY GROUP, LLC, *et al.*,

        *Defendants.*

No. 24-cv-3108 (DLF)

## <u>MEMORANDUM OPINION</u>

    Sheron Jones brings this action against Vintage Equity Group, LLC (Vintage); Dayon Arrington; SuttonPark Capital, LLC and SuttonPark Life Contingent, LLC (collectively, SuttonPark); and Truist Bank, N.A. (Truist). Before the Court is Truist's Motion to Dismiss, Dkt. 9, and Vintage's Motion to Dismiss, Dkt. 12. For the reasons that follow, the Court will grant in part and deny in part both motions.

## I.    BACKGROUND

    Jones suffers from severe cognitive impairments due to lead-paint poisoning. Am. Compl. ¶¶ 13–15, Dkt. 1-2. A middle school evaluation concluded her "deficits reflect permanent cognitive impairment which will pose life-long challenges for [her]." *Id.* ¶ 15. Her only sources of income are Supplemental Security Income, which she receives because of her Intellectual Disability, and Temporary Assistance for Needy Families. *Id.* ¶ 18. As an adult, she has been unable to find stable employment and has only briefly been employed since she turned eighteen almost 30 years ago. *Id.* Jones has never driven a car and does not have a driver's license. *Id.* ¶ 19. She lives with her fifteen-year-old daughter and her mother, Terry Jones, who helps care for her daughter. *Id.* ¶¶ 19–20.

In 1997, Jones received a monetary settlement as a result of a lawsuit following the discovery of her lead poisoning. *Id*. ¶ 17. In addition to two lump sum payments totaling $90,000, as part of the settlement, Jones is entitled to monthly payments of around $700 which began in April 1998 and will end on the later of either Jones's death or March 2028. *Id*.

Defendants Vintage and SuttonPark purchase structured settlement payment streams at a discount, typically in exchange for a lump-sum payment. *Id*. ¶ 11. In early 2021, Jones entered into an agreement with Vintage to sell a portion of her monthly annuity payments in return for lump-sum payments. *Id*. ¶¶ 23–25. Neither Jones's mother nor her daughter were aware of this agreement. *Id.* ¶ 23.

In accordance with the D.C. Structured Settlements Protection Act of 2018 (SSPA), *see* D.C. Code §§ 28A-101, *et. seq.*, which requires court approval of any structured settlement sale, Vintage filed two petitions on February 23 and August 16 of 2021 in the D.C. Superior Court seeking court approval to purchase 312 months of Jones's periodic payments. Am. Compl. ¶¶ 26–28. Jones was not represented by counsel in these proceedings. *Id*. ¶ 27.

While the agreements and transfers were being finalized, Vintage provided advance payments to Jones. *Id*. ¶ 29. Through several CashApp payments ranging from $100 to $500, Vintage paid at least $5,600 to Jones. *Id*. After the structured settlement transfers were completed, Jones repaid Vintage for these advance payments through deductions from the lump-sum payments contemplated by the agreement. *Id*.

During the Superior Court proceedings, Vintage allegedly represented to the court that Jones's dire living situation justified expedited review, *id.* ¶ 34; that Jones had entered the transfer agreement to purchase a car to expand her job search, *id.* ¶ 36; and that Jones did not experience any long-term effects from her lead-exposure, *id.* ¶ 37. Jones alleges that Vintage also misled her

regarding her right to cancel the transaction, *id.* ¶ 30, and withheld more money from its lump-sum payment to her than it was entitled to withhold, *id.* ¶ 31.  In total, Jones sold Vintage 312 months of payments—worth $467,920.68—and in return, she received $94,819.68.  *Id.* ¶ 40.

After receiving payment from Vintage in the form of three checks, *id.* ¶ 40, Jones alleges that an employee of Vintage, Dayon Arrington, drove her to Truist Bank and made her set up a checking and savings account to deposit her checks, *id.* ¶ 41.  Two days later, Jones received an email from Truist informing her that she had been enrolled in digital banking and that a biometric authentication had been activated for a mobile banking account, even though she had not signed up for online banking or submitted biometrics.  *Id.* ¶ 42.  A few days after that, Truist sent another email to Jones confirming that Arrington's contact information had been added to her account and notifying her that a $1,000 transfer to Arrington had been completed.  *Id.* ¶ 44.  Truist then closed Jones's bank account in response to fraudulent activity.  *Id.* ¶ 55.  Despite attempting to obtain information from Truist regarding what happened to the remaining money in her account via subpoena, Truist only provided Jones with nine pages of documentation, none of which sufficiently explained what had transpired.  *Id.* ¶ 60.

In April 2022, when Jones did not receive her monthly payment, she attempted to contact Arrington.  *Id.* ¶ 48.  After multiple attempts, Jones finally reached Arrington, who threatened to put her in jail if she did not stop asking about her money.  *Id.* ¶ 49.

On July 19, 2024, Jones filed a complaint against Vintage, Arrington, and SuttonPark Capital, LLC in the Superior Court of the District of Columbia, Civil Division.  *See* Compl. at 1, *Jones v. Vintage Equity Grp., LLC*, No. 2024-CAB-004523 (D.C. Super. Ct. July 19, 2024).  On September 9, 2024, Vintage filed a motion to dismiss the claims pending against it in the D.C Superior Court.  *See* Dkt. 1-11.  On September 30, 2024, Jones filed an Amended Complaint

3

amending her claims against Vintage and adding SuttonPark Life Contingent, LLC and Truist as defendants. *See* Dkt. 1-2.  On November 1, 2024, with Vintage's consent, Truist filed a Notice of Removal, removing the D.C. Superior Court action to the United States District Court for the District of Columbia based on diversity jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441.  *See* Dkt. 1.

## II.    LEGAL STANDARDS

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a defendant may move to dismiss an action for lack of subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  When reviewing a motion to dismiss for lack of jurisdiction, the court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally."  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (citation modified).  At the same time, a plaintiff bears the burden of establishing subject-matter jurisdiction, *see Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015), and courts must raise obstacles to their jurisdiction sua sponte, *see Fort Bend Cnty. v. Davis*, 587 U.S. 541, 548 (2019).

Rule 12(b)(6) allows a defendant to move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  A complaint need not

contain "detailed factual allegations," *Iqbal*, 556 U.S. at 678, but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility," *id.* (internal quotation marks omitted).

When deciding a Rule 12(b)(6) motion, well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (citation modified). But the Court need not accept "a legal conclusion couched as a factual allegation" nor an inference unsupported by the facts alleged in the pleadings. *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

On a Rule 12(b)(6) motion, the court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials. *EEOC v. Saint Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A Rule 12(b)(6) dismissal "is a resolution on the merits and is ordinarily prejudicial." *Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992).

## III.    ANALYSIS

### A.    Subject Matter Jurisdiction

Federal courts are courts of limited subject matter jurisdiction, *see* U.S. Const. Art. III, § 2, and it is "presumed that a cause lies outside this limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Vintage raises two jurisdictional challenges to Jones's

complaint. It first argues that the *Rooker-Feldman* doctrine precludes Jones's claims involving the 2021 SSPA proceedings in the D.C. Superior Court. Vintage Mot. to Dismiss at 11. Vintage further argues that any challenge to the transfer agreements must be brought under Rule 60(b) of the D.C. Superior Court Rules. *Id.* at 14–18. The Court will reject both challenges.

1. *The Rooker-Feldman Doctrine*

"The *Rooker-Feldman* doctrine prevents lower federal courts from hearing cases that amount to the functional equivalent of an appeal from a state court." *Gray v. Poole*, 275 F.3d 1113, 1119 (D.C. Cir. 2002) (citing *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Tr. Co.*, 263 U.S. 413 (1923)); *see United States v. Choi*, 818 F. Supp. 2d 79, 85 (D.D.C. 2011) (noting federal district courts "generally lack[ ] appellate jurisdiction over other judicial bodies, and cannot exercise appellate mandamus over other courts"). The Supreme Court has clarified that the doctrine is "confined to cases . . . brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

The doctrine is inapplicable here because Jones is not a state-court loser. The state court did not preside over an adversarial proceeding where opposing parties sought opposite outcomes. Rather, the state court order approved an agreement both parties purportedly supported. *See White v. Symetra Assigned Benefits Serv.*, No. 20-cv-1866 (MJP), 2021 WL 3472408, at *3 (W.D. Wash. Aug. 5, 2021). The fact that Jones now seeks to void the agreement does not change the procedural posture of the case because Jones did not lose before the state court.

Vintage fails to point to a single case, in this circuit or otherwise, in which a court applied *Rooker-Feldman* to analogous circumstances where a state court had merely approved an

agreement that both parties desired.  In *Shooting Point v. Cumming*, 368 F.3d 379 (4th Cir. 2004), for example, the state court settled a private property dispute for parties in opposition to each other, *id.* at 384.  The parties were similarly opposed in *Brown & Root, Inc. v. Breckenridge*, 211 F.3d 194 (4th Cir. 2000), where employees in a labor dispute challenged the state court decision declining to compel defendants to arbitration, *id.* at 196.  Finally, *Jordahl v. Democratic Party of Va.*, 122 F.3d 192 (4th Cir. 1997) and *In re Madera*, 586 F.3d 228 (3d Cir. 2009) both stand for the proposition that a state court loser cannot ask a federal court for relief that is "inextricably intertwined" with the state court judgment.  *Jordahl*, 122 F.3d at 202–03; *accord* In *re Madera*, 586 F.3d at 232.  The plaintiffs in both cases lost before the state court—the plaintiff in *Jordahl* was subject to an injunction, while the plaintiff in *Madera* was subject to a foreclosure judgment.

*Rooker-Feldman* also does not apply for an independent reason—Jones's alleged harm was not caused by the state court decision.  Jones claims that Vintage lied to the state court and told her how to answer the judge's questions.  Am. Compl. ¶ 38.  Under that theory, Jones was induced to enter the agreement through the defendants' manipulation, not through any court order.  In other words, the harm to Jones came from the actions Vintage took to unduly influence her and the court, not from the court itself.

Although the D.C. Circuit has not yet addressed this issue, a majority of circuits have declined to apply *Rooker-Feldman* in analogous circumstances.  *See Cho v. City of New York*, 910 F.3d 639, 647 (2d Cir. 2018) (declining to apply *Rooker Feldman* when the alleged harm was from conduct leading to the settlement, not the court's ordering of the settlement); *Truong v. Bank of Am., N.A.*, 717 F.3d 377, 383 (5th Cir. 2013) ("If, on the other hand, a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does not bar jurisdiction.") (quoting *Noel v. Hall*, 341 F.3d 1148, 1164 (9th Cir. 2003)); *see also Great W.*

*Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 171 (3d Cir. 2010) (finding *Rooker-Feldman* doctrine did not bar claim that defendants improperly influenced state court judges in judgment); *McCormick v. Braverman*, 451 F.3d 382, 392–93 (6th Cir. 2006) (allowing claim that defendant committed fraud in state-court proceeding, but barring claim challenging the order itself); *Quick v. EduCap, Inc.*, 318 F. Supp. 3d 121, 134 (D.D.C. 2018) (finding jurisdiction where the injury stemmed not from the judgment but from injurious actions of the other party). *But see Iqbal v. Patel*, 780 F.3d 728, 729 (7th Cir. 2015); *Fielder v. Credit Acceptance Corp.*, 188 F.3d 1031, 1035–36 (8th Cir. 1999). Because *Rooker-Feldman* is not applicable to these circumstances, the Court has jurisdiction to consider Jones's SSPA claims.

2. *Rule 60(b)*

Under Rule 60(b) of the D.C. Superior Court Rules, D.C. Super. Ct. R. 60(b), the transfer agreements do not merge with the state court order, and thus, Jones can bring her contract claims.

The only two cases Vintage cites for the proposition that a contract merges with a court order are both found in the divorce context. *See D.D. v. M.T.*, 550 A.2d 37, 48 (D.C. 1988); *Duffy v. Duffy*, 881 A.2d 630, 639 (D.C. 2005). To the Court's knowledge, this principle does not extend beyond divorce settlements, and there are good reasons to cabin this doctrine to that area. Merging a settlement decree with a court order grants the court "discretion to modify its own order based on a showing by either party of a material change in the circumstances of either the child or the parents." *Duffy*, 881 A.2d at 639. This enables a court to adapt the parties' obligations to best address the needs of the children and parents.

But outside this unique context, ordinary contract remedies provide adequate redress. And although the SSPA requires a court order before transfer agreements can be enforced, the SSPA also provides that disputes regarding transfer agreements, including breach, shall "be determined

in and under the laws of the District." D.C. Code § 28A-107(b). This suggests D.C. substantive laws—and not merely Rule 60(b)—govern challenges to a transfer agreement. This Court therefore has jurisdiction to review Jones's challenges to the transfer agreement.

### B.    Failure to State a Claim

1.    *Contract Claims (Counts I, II, X)*

Vintage moves to dismiss two of Jones's contract claims challenging the transfer agreement, Counts I and II, under Rule 12(b)(6).[1] Truist also moves to dismiss Jones's contract claim against it, Count X.

**Count I.** A contract is voidable if a party who entered into the contract was "unable to understand in a reasonable manner the nature and consequences of [a] transaction" because of "mental illness or defect." Restatement (Second) of Contracts § 15(1) (1981); *see Hernandez v. Banks*, 65 A.3d 59, 66–67 (D.C. 2013). The complaint alleges that Jones suffers from "serious, permanent, and irreversible neuropsychological injuries" due to childhood lead poisoning. Am. Compl. ¶¶ 13–15, 68. Her middle school IQ was in the bottom 0.2 percentile. *Id.* ¶ 15. And she relies on her mother for assistance in assessing the "issues, options, risks[,] and consequences" of her decisions. *Id.* ¶¶ 18, 22. These alleged facts are sufficient to allow the inference that Jones's transfer agreements with Vintage are voidable because of her mental incapacity. Count I will survive Vintage's motion to dismiss.

**Count II.** To support a claim of unilateral mistake, a party must show (1) that "one party was mistaken at the time of contracting as to a basic assumption having a material effect on the agreement;" and (2) that either "(a) the effect of the mistake is such that enforcement of the contract

---

[1] Vintage also moves to dismiss Jones's breach of contract claim, Count VII, because it merged with the final order and is untimely under Rule 60(b). The Court already rejected that argument, and Vintage does not argue Jones failed to state a breach of contract claim as a matter of law.

would be unconscionable, or (b) the other party had reason to know of the mistake or his fault caused the mistake." *Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 302 (D.C. 2006) (citation modified).

Unilateral mistake can serve as a standalone cause of action, and Vintage offers no support for the contrary. Vintage's only citation, *Akassy*, 891 A.2d at 302, merely observes that unilateral mistake can serve as a defense. *See id.* at 302. But that case does not hold that the claim functions exclusively as a defense, and Jones has stated a claim here.

As the complaint alleges, Jones did not understand that she was surrendering her annuity payments through the transfer agreement. Am. Compl. ¶ 73. Contrary to Vintage's assertion, Vintage Mot. to Dismiss at 20, the Court must accept this alleged statement of fact as true. Drawing all reasonable inferences in Jones's favor, Jones did not understand a material effect of the agreement. Jones also plausibly alleges that Vintage had reason to know of the mistake. Indeed, Vintage instructed her how to answer questions at the hearing, meaningfully interfering in a process that was intended to protect her. Am. Compl. ¶ 38. Vintage further misled the court regarding Jones's need for the settlement. *Id.* ¶¶ 34–37. And Vintage interfered with her receipt of court filings by knowingly providing the state court with an incorrect address. *Id.* ¶ 84. Taken together, these facts support an inference that Vintage knew it was taking advantage of Jones and contributed to her misunderstanding. Thus, the Court will deny Vintage's motion to dismiss Count II.

**Count X.** To plausibly state a breach of contract claim, a plaintiff must allege "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by [the] breach." *Bonfire, LLC v. Zacharia*, 251 F. Supp. 3d

47, 51 (D.D.C. 2017) (quoting *Logan v. LaSalle Bank Nat'l Ass'n*, 80 A.3d 1014, 1023 (D.C. 2013)).

Truist concedes that a valid contract existed between Jones and Truist. Truist Mot. to Dismiss at 9. And Jones alleges that Truist breached its contractual obligations to her by possessing her deposited funds and denying her the exclusive right to withdraw the funds. Am. Compl. ¶ 126. That is sufficient to state a plausible breach of contract claim. *See Burnett v. Am. Fed'n of Gov't Emps.*, 102 F. Supp. 3d 183, 192 (D.D.C. 2015); *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015).

Relying on documents outside the complaint, Truist argues that it did not commit the alleged breach because Jones's accounts had been closed. As an initial matter, the Court cannot consider the subpoenaed documents on which Truist relies. Although Jones briefly alludes to the documents in her complaint, they are not "central to [her] claim," *Strumsky v. Wash. Post Co.*, 842 F. Supp. 2d 215, 217–18 (D.D.C. 2012), and have not been incorporated by reference. At this stage, the Court must accept Jones's allegations as true and draw all reasonable inferences in her favor. *Hettinga*, 677 F.3d at 476. Accordingly, Count X will also survive Truist's motion to dismiss.

### 2. *D.C. Consumer Protections and Procedures Act (Counts III, XI)*

Jones alleges that both Vintage (Count III) and Truist (Count XI) engaged in unfair trade practices in violation of the D.C. Consumer Protections and Procedures Act (CPPA). The CPPA makes it unlawful "to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby." D.C. Code § 28-3904. The statute provides a non-exhaustive list of practices that would violate the statute, including misrepresenting a material fact or failing to state a material fact that has a tendency to mislead. *Id.* § 28-3904(e), (f). The

CPPA "is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers," *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 722–23 (D.C. 2003) (quoting *Atwater v. D.C. Dep't of Consumer & Regul. Affs.*, 566 A.2d 462, 465 (D.C. 1989)), and should be "construed and applied liberally to promote its purpose," D.C. Code § 28-3901(c).

**Count III.** Under the CPPA, a consumer is "a person who . . . receive[s] consumer goods or services." D.C. Code § 28-3901(a)(2)(A). Conversely, a merchant is one who "in the ordinary courses of business…would sell, lease (to), or transfer…consumer goods or services." *Id.* § 28-3901(a)(3)(A). "A merchant includes one who sells consumer credit as well as those entities which take an assignment of the credit account and continue the extension of credit to the consumer." *Jackson v. Culinary Sch. of Wash.*, 788 F. Supp. 1233, 1253 (D.D.C. 1992); *see* D.C. Code § 28-3901(a)(7). The parties dispute whether Vintage's business model—purchasing future payment streams from structured-settlement holders in exchange for cash up front—can be analogized to consumer credit for the purposes of the CPPA.

Vintage characterizes its role as a "'transferee' that purchased structured settlement payment rights." Vintage Mot. to Dismiss at 22. But a seller of consumer credit could also be redefined as "purchasing" the right to future payments. Similarly, Vintage claims that Jones was never "expected to repay the funds that she received from Vintage," *id.*, unlike in a creditor relationship where the consumer repays the loan. Alternatively, Jones repaid the loan she received from Vintage through monthly payments of $720—an amount that would also encompass interest. Even though Jones herself did not personally transfer the $720 dollars to Vintage, given the broad purpose of the CPPA, this is sufficient to state a claim.

12

Vintage also briefly argues that the agreement cannot fall under the CPPA because it constituted financial or commercial activity. *Id.* at 21. But courts have interpreted the CPPA to cover transactions of financial goods and consumer purchases for pecuniary benefit. *Solomon v. Falcone*, 791 F. Supp. 2d 184, 191 (D.D.C. 2011) (applying the CPPA to "ma[king], fund[ing], and/or securitize[ing] unconscionable" refinanced mortgage loans); *Ford v. ChartOne, Inc.*, 908 A.2d 72, 83 (D.C. 2006) (applying the CPPA to the purchase of medical records when purchaser used records to seek financial gain). That Jones received money in exchange for transferring her settlement payment rights does not remove this case from the protections of the CPPA. The Court will therefore deny Vintage's motion to dismiss Count III.

**Count XI.** Truist does not contest that it had a consumer-merchant relationship with Jones. Instead, Truist claims that Jones failed to plausibly allege that it engaged in any unfair or deceptive trade practice. Truist Mot. to Dismiss at 10. As alleged, Truist withheld records from her when she requested information related to her bank account. Am. Compl. ¶¶ 136, 138. This prevented Jones from locating the missing funds she had deposited into her Truist account. *Id.* ¶¶ 136–38.

Jones is incorrect that invoking the Consumer Protection Act (Dodd-Frank Act), 12 U.S.C. § 5481, *et seq.*, is sufficient under the CPPA. The CPPA allows actions challenging "a trade practice in violation of a law of the District." D.C. Code § 28-3905(k)(1)(A). By its plain text, the CPPA limits the cause of action to violations of D.C. law. As Jones points out, this includes violations of laws that are "not specifically enumerated elsewhere in the CPPA," *Mann v. Bahi*, 251 F. Supp. 3d 112, 121 (D.D.C. 2017), including violations of the "common law," *Osbourne v. Cap. City Mortg. Corp.*, 727 A.2d 322, 325 (D.C. 1999). But that broad language does not include violations of federal law.

Even so, Jones plausibly alleges a CPPA claim. Withholding information that a consumer is entitled to clearly fits within the parameters of the CPPA, which prohibits unfair trade practices including those which "provide information about" a consumer good. D.C. Code § 28-3901(a)(6). Jones alleges that Truist engaged in an unfair trade practice by unlawfully withholding information from her and preventing her from locating the funds in her bank account, in violation of its contractual obligations. Am. Compl. ¶¶ 134, 138; Jones Opp'n at 41, Dkt. 17. Drawing all inferences in her favor, as the Court must, Jones has plausibly alleged a CPPA claim. That she also may be able to acquire additional documentation through a motion to compel is irrelevant, as relief under the CPPA is "cumulative" of any other available remedy. D.C. Code § 28-3905(k)(2). The Court thus will deny Truist's motion to dismiss Count XI.

3.    *Structured Settlements Protections Act Claim* (Count IV)

Although the SSPA does not explicitly create a cause of action for individuals to seek remedies of SSPA violations, Jones argues that it contains an implied cause of action. This is a matter of first impression. Three factors are relevant to determining whether a state law creates an implied cause of action:

> "First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted'? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?"

*In re D.G.*, 583 A.2d 160, 166 (D.C. 1990) (quoting *Cort v. Ash*, 422 U.S. 66, 78 (1975)) (citation modified). The "ultimate issue is whether the legislature intended to create a particular cause of action, because unless such [legislative] intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Coates v. Elzie*, 768 A.2d 997, 1001 (D.C. 2001) (citation modified). The plaintiff bears the burden of demonstrating an implied right. *Id.*

Although Jones as a structured settlement payee is among the class for whom the statute was enacted, *see In re D.G.*, 583 A.2d at 166, the Court does not discern a clear intent of the D.C. Council to create a private right of action that enables payees to sue for money damages. The SSPA was enacted in 2018, after other states had enacted similar statutes, and unlike several states, D.C. has not amended the statute to include a private right of action, *see* Jones Opp'n at 16 (citing La. Rev. Stat. § 9:2713.3(b) (effective July 1, 2020); GA Code § 51-12-74(b) (effective July 1, 2021); Nev. Rev. Stat. § 42.370(2) (effective October 1, 2021)). Further, the SSPA grants "means of enforcement" apart from a private right of action. *See Kelly v. Parents United for D.C. Pub. Schs.*, 641 A.2d 159, 165 (D.C. 1994). The Act states that "disputes . . . shall be determined in and under the laws of the District." D.C. Code § 28A-107(b). Thus, parties subject to the SSPA may vindicate their rights through ordinary common law and state law causes of action in D.C., just as Jones is doing in this case. Absent language or some other source from which to imply a private remedy, Jones cannot bring an action for money damages under the SPPA. Accordingly, the Court will dismiss Count IV for failure to state a claim.

### 4.    *Conversion Claims* (Counts V, VI, IX)

To bring a conversion claim, a plaintiff must allege "(1) an unlawful exercise, (2) of ownership, dominion, or control, (3) over the personal property of another, (4) in denial or repudiation of that person's rights thereto." *Xereas v. Heiss*, 933 F. Supp. 2d 1, 6 (D.D.C. 2013) (citation modified). In general, money is not personal property for purposes of a claim of conversion. *See McNamara v. Picken*, 950 F. Supp. 2d 193, 194 (D.D.C. 2013). To succeed on a claim of conversion of money, a plaintiff must be entitled to "a specific identifiable fund of money" that was seized by the defendant. *Edwards v. Ocwen Loan Servicing, LLC*, 24 F. Supp. 3d 21, 30 (D.D.C. 2014) (emphasis and citation omitted); *see Campbell v. Nat'l Union Fire Ins. Co. of*

*Pittsburgh*, 130 F. Supp. 3d 236, 259 (D.D.C. 2015) ("As a general rule, money, i.e., currency, is not subject to a claim of conversion unless the plaintiff seeks to recover specific segregated or identifiable funds." (citation modified)).   "[A] claim for conversion of money may not be maintained to enforce a contractual obligation for payment of money."  *Cuneo L. Grp., P.C. v. Joseph*, 669 F. Supp. 2d 99, 123 (D.D.C. 2009) (citation modified).

Jones points to three different funds of money in her conversion claims.  First, Jones claims Vintage and Arrington converted $1,000 from her bank account (Count V).  Am. Compl. ¶¶ 92–96.  Next, Jones accuses Vintage of converting the entirety of her structured settlement payments (Count VI).  *Id.* ¶¶ 100–07.  Finally, Jones raises a conversion claim against Truist for converting the remaining money she deposited into her bank account (Count IX).  *Id.* ¶¶ 121–24.

**Count V.**  Jones has pleaded facts to establish a possessory interest in a specific, identifiable fund of money that Arrington took from her bank account.  As alleged, the bank account exclusively contained funds from the lump-sum payments Jones received for the sale of her structured settlement payments.  *Id.* ¶ 41.  Arrington withdrew at least $1,000 of those funds without her permission.  *Id.* ¶ 55.  That $1,000 is a sufficiently identifiable fund of money.

This case is analogous to *JSC Transmashholding v. Miller*, 70 F. Supp. 3d 516 (D.D.C. 2014), in which a third party embezzled $20 million from the plaintiff, *id.* at 521, and then transferred $600,000 of those embezzled funds to the defendant, *id.* at 519.  The district court found that the $600,000 qualified as specific funds capable of conversion because they were distributed directly from the bank account containing the embezzled $20 million.  *Id.* at 522.  Like the $600,000 of embezzled funds in *Transmashholding*, the $1,000 in Jones's bank account rightfully belonged to her.  And Arrington's withdrawal of the $1,000—like the transfer of the $600,000 in *Transmashholding*—converted a specific fund of money to which Jones was entitled.

Even so, Vintage cannot be held vicariously liable for Arrington's actions taken outside the scope of his employment.  *See* Vintage Mot. to Dismiss at 25.  Although Jones concedes that Arrington did not act within the scope of his employment, she nonetheless argues that liability attaches because Arrington had apparent authority to act on behalf of Vintage.  Jones Opp'n at 28.

The D.C. Court of Appeals has not expressly adopted the Restatement (Second) of Agency's apparent authority approach to vicarious liability.  *Buie v. District of Columbia*, 273 F. Supp. 3d 65, 68 (D.D.C. 2017).  Still, the district court in *Buie* applied the apparent authority approach because, unlike here, the defendant in that case conceded that the apparent authority approach applied.  *Id*.  Also unlike here, that defendant used the hallmarks of his employment to convert the funds.  *Id.*; *see also Doe v. Sipper*, 821 F. Supp. 2d 384, 386–87 (D.D.C. 2011) (same).  Arrington, in contrast, did not hold himself out as an employee of Vintage, nor did he transfer Jones's funds to Vintage.  Instead, he acted as an individual, picking Jones up from her home, Am. Compl. ¶ 41; informing bank employees that he was Jones's "friend," *id.*; and transferring Jones's funds directly to himself using Zelle, *id.* ¶ 44.

Under D.C. law, Vintage cannot be held vicariously liable for actions Arrington took outside the scope of his employment.  *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) (instructing federal courts to apply state substantive law).  Absent any suggestion from the D.C. Court of Appeals that the Restatement's apparent authority approach applies, the Court declines to expand D.C. law.  Accordingly, the Court will dismiss Count V.

**Count VI.**  Unlike the $1,000, Jones's entitlement to her structured settlement payments cannot support a claim of conversion.  Structured settlement payments are a "contractual obligation for payment of money."  *Cuneo*, 669 F. Supp. 2d at 123 (citation modified).  Although Vintage now receives Jones's settlement checks, Jones's "ability to gain possession or control of the

fund . . . was wholly contingent on [a third party] meeting its obligation . . . to transfer the funds." *Curaflex Health Servs. v. Bruni*, 877 F. Supp. 30, 33 (D.D.C. 1995). Thus, Vintage took possession of Jones's contractual right, not possession of concrete personal property of the type necessary to support a claim for conversion. The Court will therefore dismiss Count VI.

**Count IX.** Jones similarly cannot support a claim for conversion against Truist for the $1,000 in her bank account. Money possessed by a bank is traditionally characterized as a loan. *Roberts v. United States,* 508 A.2d 110, 113 (D.C. 1986) ("That deposits in banks become property of the bank, creating only a simple debtor-creditor relationship between bank and depositor, is universally recognized.") (citation modified). A bank's inability to pay back a loan, therefore, is viewed as a default on a loan, rather than a conversion of money. The obligation to repay a loan likewise is not properly classified as conversion. *See Curaflex*, 877 F. Supp. at 32. Because Jones merely alleges that Truist continues to possess the money she deposited in the bank, the Court will dismiss Count IX.

## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part both motions to dismiss, Dkts. 9, 12. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

July 28, 2025

18